Let me ask a preliminary question. Apparently, Mr. Jones got $22 million to spend on whatever he wanted to spend on, and Jennings got something like $438,000, and he's got the big sentence and Jones has the little sentence. Is that an accurate reflection of the facts? Justice Breyer Well, Your Honor, I was going to announce that I'm only going to deal with the instructional issue, and Mr. Jennings' attorney will be dealing with the sentence. I agree with that. Justice Kagan You probably better tell us who you are, just for the record. It's not – it's our fault, because we jumped in. Justice Breyer It's Barry Morris. I represent Mr. Jones in this matter. We're dividing up the – Justice Kagan Well, just very briefly, though, I think that the answer is that's not correct, that Jones did get a larger sentence. Justice Breyer Yeah, he got a long sentence, too. He – Justice Kagan A larger – a longer sentence. Justice Breyer I believe so, but he got more money, so – Justice Kagan I understand that. Justice Breyer We're not arguing the sentence. Justice Kagan Okay. Well, we'll ask Mr. Jennings' lawyer. Go ahead. Justice Breyer Okay. There are some basic constitutional principles involved in this case. Justice Kagan You're going to have to watch your time so that Ms. Young gets some time. Justice Breyer Okay. Justice Kagan Okay. Justice Breyer There are three basic constitutional principles that are involved in this case. A defendant is entitled to present a defense. A defendant is entitled to have the jury informed of that defense. And the defendant is entitled to have the jury instructed as to who has the burden of proof on that defense. In this case, the jury was never instructed as to the defense, namely that good faith is a complete defense, not just something that could be considered. And secondly, and most importantly, the jury was never instructed that the prosecution has the burden of disproving good faith. Now, I realize there are a line of Ninth Circuit cases saying that if the jury is instructed on intent to defraud, there's no reason to instruct on good faith. Justice Kagan Well, why aren't you just precluded by the Shipsy case? I mean, it seems to me your argument may have some force, but Shipsy just seemed exactly the same. Justice Breyer Well, Shipsy never considered the constitutional implications of not informing the jury of the defense. Justice Kagan Well, the jury did hear that they may consider that they could consider the good faith. Justice Breyer Yes, but in a homicide, if the jury is instructed that they consider self-defense, but was never instructed that self-defense was a defense to the charge, I'm sure the Court would agree that would be an inadequate instruction to the jury. Juries, you know – Justice Kagan So, just to understand this, what you're saying about Shipsy is, yes, it was exactly the same, but it didn't say that it was deciding it on a constitutional ground? Justice Breyer Well, no, it didn't consider the constitutional implications of not instructing the jury specifically on a good faith defense, and most importantly, on the burden of proof. I don't think the Shipsy case – I don't think the Shipsy case was a good faith defense. Justice Kagan The district court's charge, I'm reading from Shipsy, clearly included the requirement that the government have the burden to prove each element, including the element of intent beyond a reasonable doubt. Was that not true here? Justice Breyer I mean, they have – that's true. I don't have the case right in front of me. Justice Kagan Second, the court correctly instructed the jury on the definition of intent, an intent to deceive or cheat, right? Same here? Justice Breyer Yeah. Justice Kagan Third, the court did, in fact, charge that a good faith belief in the truthfulness of representations made could be considered in determining intent. Justice Breyer Yes. Justice Kagan That's true here, too, right? So how's it different? Justice Breyer Well, what's different is, in this case, the Shipsy – Shipsy did not consider the impact of Matthews, namely that it says that a defendant's entitled to an instruction on his defense. And there was no instruction that told the jury that it was a complete defense, just that it could be considered. Of course, it's correct to say that good faith can be considered, but that doesn't go far enough. And I don't know that the defendant in Shipsy contended that it did – that the court erred by failing to instruct that good faith was a complete defense. That's the issue in this case. Justice Kagan Shipsy first argues that the district court erred by rejecting his proposed jury instruction on good faith as defense for the fraud charges. And he – and he suggested a instruction that good faith was a complete defense to those charges because good faith is inconsistent with an intention to fraud. Those are the facts of Shipsy. I just think you've got a real problem. Justice Breyer Well, it is a problem. Justice Kagan Ha, ha, ha. Justice Breyer Here's – here's my plan. It seems to me that the – the – the case, with all due respect to the – the panel decision in that case, did not consider the constitutional implications of that instruction because the – the – Matthews said the defendant has a right to an instruction on his defense. And the Shipsy panel did not consider the constitutional rights for a jury to be told what they were supposed to be told, namely, that it's a complete defense. Nobody – I – I don't think anybody argues with the fact that good faith is a complete defense. Assuming that it is, then why is this instruction different from all other instructions and not constitutionally compelled? I mean, Shipsy, you know, said that the instruction was adequate, but I don't think it considered it in terms of the constitutional implications of giving – Kagan Is it – is it – is it so clear that when you say may consider, and I don't remember what the exact language was, but that it means – there are other ways to – to – to prove that there was not an intent to defraud other than through good faith. Justice Breyer Well, that you didn't do it, I mean, or – Kagan Yeah. So – so one of the ways that you can prove it is by good – by proving good faith, and maybe – why isn't that all the jury was being told? Justice Breyer Well, because – well, I come back to the example of a murder case. Would – would this Court hold that if a judge instructed a jury that in considering whether or not the defendant is guilty of first-degree murder, you may consider self-defense? I mean, jury – you see, you know, there's lots of stuff that we know as lawyers, because we read the stuff, we're familiar with cases, we know how to reason back and forth. Juries, you drag them in off the jury before, and then they get these whole bunch of instructions all at once, and they're supposed to vault through three years of law school and come up with a verdict. So I think it's incumbent on courts to require the trial courts to instruct the jury exactly and completely, and not presume that the jurors would know more than they're told. Kagan Well, but do the lawyers get to sit there like potted plants? I mean, first it came up, and then the court came up with something, and then defense counsel rolled with it. So I'm – I'm not sure – I mean, there was focus on the issue. It wasn't just an oversight. And when the court proposed something, there – you know, there was no objections. Kennedy Right. Lawyers are not potted plants. Ginsburg I thought that wasn't exactly what happened. I thought this language was actually affirmatively presented by the defendants. Kennedy The – what happened – the sequence of events you – the court's correct. The sequence of events is that there was a proposed instruction, the government's instruction, and then eventually – Ginsburg I proposed this language, the language that you're now objecting to. Well, the language – Kennedy I didn't, but – Ginsburg I said your language. I said this language that you're now objecting to. Kennedy Okay. Now, I understand. And unfortunately, incompetence of counsel can't be raised on direct appeal. So that's not before the court at this point. On the other hand, what is before the court is whether or not the – the district court properly invoked its duties to instruct the jury properly. In other words, if a defense attorney comes up with some silly instruction, the court can't simply say, well, defense attorneys wanted it, therefore I gave it. Ginsburg And you'd say there was no invited error because there's no indication that they knew there were – that there was a choice. Kennedy Right. It has to be a knowing – a knowing – a knowing waiver of a known right. And clearly, the defense attorneys here were – you know, they weren't on the ball. And I can't explain why, and it's not habeas, and it's not on the record. But the instruction that went to the jury was wrong. It should have told them that it was a complete defense. Kagan I don't want your colleague to argue. If so, you should probably stop now. Kennedy Oh, yeah. Oh, yes, there it is. I'm sorry. It took a minute of her time. I apologize. Kagan Thank you very much. I do want to turn to the issues that Mr. Jennings raises uniquely. I also want to reserve a few minutes of time for rebuttal. Judge Fletcher raised the issue of the proportionality of the sentences. Mr. Jennings, Judge Fletcher mentioned that he received $438,000. That included some amounts that, in fact, didn't come to him but came to his father-in-law. The amount that Mr. Jennings received was actually about $250,000. Mr. Jones received about $21 million. Ginsburg But who got the biggest – who got the biggest sentence? Kagan Mr. Jones received the largest. Ginsburg Okay. So your client did get some – some – by about 7 or 8 years, right? Kagan I'm sorry, Your Honor. Ginsburg By about 7 years or something like that? Kagan Yes. He had 144 months. Mr. Jones had 240 months. Mr. Sinberg, who got about $588,000, received 108 months. So there was some, with the exception of Jones and Sinberg who were – I mean Jennings and Sinberg who are reversed, there was Mr. – we're arguing that the disparity was not great enough. Mr. Jennings obviously got 1 percent of the amount that Mr. Jones got, whereas his sentence is 144 months and Mr. Jones was 240 months. So Mr. Jones was sentenced at a higher level, but we're arguing that it was still disproportionately high. Kagan But a lot of the money that Jones got, as I understand it, was given to him purportedly to do work on behalf of the scheme, but he didn't do it. So it isn't – it isn't that he was necessarily a more responsible person in the scheme. It's that he then made off with some of the money from the scheme, essentially. Ginsburg Yes. Our argument is – one of the bases on which we're contending Mr. Jennings' sentence was unreasonable was because the Court said, it doesn't matter to me – it doesn't make Mr. Jennings less culpable because he only got 1 percent and Mr. Jones went away with $21 million. Mr. Jones was in charge of the purported gold deal, and that was sent – that was presented to the investors as something that they should invest in and they would make a huge reward from. And so all that money went to him for the gold deal. Kagan But he did sentence him to a lot less. That was with regard to the restitution, wasn't it? And to the loss figure. That's another issue that we raised. But with respect to – when he was discussing the reasonableness and the issues that went to reasonableness, he said, I don't think that Mr. Jennings is any less culpable than Mr. Jones just because he got essentially 1 percent and Mr. Jones got 99 percent. Well, okay. He did. And the prosecutor apparently was on board with you. They were – but – That's correct. But a court doesn't – you know, that's one of those things where people always think that the court just goes with the prosecutor. But here the court said, no, I don't see it the same as either of you see it. And it seems to me the court was entitled to, you know, look at it differently. Well, see, that's our point, Your Honor, because he's saying – The court doesn't have to follow what the lawyers say. No, you're absolutely wrong, Your Honor. And what we're contending is in some other case that might be true. It might be true that a disparity in the amount of the proceeds would not reflect difference in culpability. We're saying in this case, because of the unique circumstances of this case, that was an unreasonable decision. Because in this case, the reason that Jennings got 1 percent and Jones got 99 percent was because Jennings was as defrauded by Jones as all the other investors were. He believed in Jones. That's why Jennings turned over 99 percent of the proceeds to Jones, because he believed that this gold deal was real. And to the extent he did, he wasn't culpable. Well, the jury obviously didn't think that. I'm sorry, Your Honor. The jury actually didn't – must have not believed that, or he couldn't – The fact that he thought the gold was real because he then wouldn't, presumably, have been convicted of the misrepresentations to the investors, at least some of them, which had to do with the gold. Well, see, that ties into, again, the issues of the jury instructions that we're talking about. And it also ties into – the judge did say that. The jury found your defense frivolous. And we're also disputing that because, in fact, two jurors said this was a very difficult case. And it certainly couldn't have been a difficult case as to Mr. Jones, who spent $21 million of investor money on basically a lavish lifestyle. The last piece of your argument that I have some interest in, particularly, is this one count as to which you say there wasn't substantial evidence. I don't understand what the evidence is. I mean, I'd like to hear you argue that, because it seems possibly to be right. Well, Your Honor, that count talks about something that happened in 2002. Now, it's – and with respect to, I think, an Arkansas gold mine, which, in fact, there never – I mean, an Arkansas coal mine, which there never was, and then it also talks about a gold deal. And at that point in 2002, Mr. Jennings still believed Mr. Jones. That was only a few months after Mr. Jones had been brought on board. And to the extent that he believed him and believed this misrepresentation, then he couldn't have been guilty – it couldn't have been a fraudulent misrepresentation. Okay. But if the jury didn't believe that he didn't know, then is there sufficient evidence? If they were properly instructed. I mean, a lot of this ties together with the instructions. What about this Arkansas gold mine, Kentucky gold mine? Yes. If it was about an Arkansas gold mine, there was never an issue with an Arkansas gold mine. That's correct. That's part of the argument. It was about a coal mine and a gold deal. And so with respect to the coal mine, it's clear that there's no evidence as to a coal mine. Would that matter, though? Because if it was partly right, that would still be the connection. Well, that's why we claim the gold deal was incorrect, because he couldn't have been fraudulent with respect to the gold deal, because that was very early on when he had no reason to suspect that Mr. Jones was being fraudulent. And if there are no further questions, we have about a minute left. Thank you very much. We'd like to reserve some time for rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Assistant United States Attorney Ruth Pinkle on behalf of the United States. Your Honors, in this case, the jury instruction as given reflected the law of this circuit at the time and continues to reflect the law of this circuit. But it doesn't sound right, does it? I mean, can you defend it on its merits as well, other than that we've made mistakes? Your Honor, actually, as part of preparation for this, I decided to look at the new Ninth Circuit pattern instruction, which came out just a few months ago. And it's  We're not bad by that. Including the commentary, including the commentary which quotes directly from the Mullen arrow. But I'm fine. But tell me substantively why it's correct to say that the jury can consider it rather than that it's a complete defense. Well, I think what's particular to a fraud case is there are some things that are not considered a defense. So I think it's difficult. You have to temper that good It's not a defense to rely upon the negligence of the victim. Well, then it should say it's a complete defense unless X and Y. Exactly. It's not a defense. It doesn't say that. Pardon me? It doesn't say that. It does not, Your Honor. However, it cannot be plain error if the court and the parties were relying upon the law as it exists in this circuit. So in other words, you can't defend it, it's just that we've been wrong before. Pardon me? You can't defend it substantively, we've just made this mistake and we're bound by it. I mean, that's what you're telling me, because you're not willing to defend it substantively. Well, Your Honor, I mean, it does say good faith in the belief of the specific misrepresentations and led the indictment. You can consider that. Did the defendant have the intention? Which certainly implies that you could also not consider it and also that it's only a consideration. Isn't that what anybody can understand it to mean? Yes, Your Honor. Although, in this case, when we're talking about whether or not the district court plainly erred, it was relying upon the law as it existed then and as it still exists now. Well, okay. Other than that that's the way that it's been done. If you have to have the intent to defraud, if that's an element of the crime, if you in good faith believed that it was okay, then wouldn't you not have the intent to defraud? Aren't those mutually exclusive? Yes, they are. So the instruction as we've been giving it is wrong? I don't believe it's wrong based upon law. Okay. You haven't told us why you don't believe it's wrong. Your Honor, all of the case law in this circuit, including a case that just came down late Friday, the Bush case, talk about intent to defraud and good faith defense. And the case that came down on Friday was the Bush case, and it had to do with whether or not the district court erred in refusing to give an advice of counsel instruction. But even in that case, in affirming the district court, the Ninth Circuit said good faith is not a separate defense. It's a circumstance indicating. Well, it seems plain that they didn't have to give any good faith instruction for that reason. Yes. And we have lots of cases that say you don't have to give any, but that's not a reason to give a misleading one, a confusing one, and one that's going to lead in the wrong direction. Well, Your Honor. You could have said, no, I'm not going to do it. Pardon me? You could have refused to do it at all, but he didn't do that, the district judge. He gave one, but he gave one that most people reading it might well read as saying that they – it isn't a complete defense. Well, Your Honor, he gave the one requested by the parties. Now, Mr. Morris mentioned that his – that Jones' counsel gave a silly instruction. It was incompetent. But the language actually proposed by Defendant Jones and then later withdrawn was, in fact, the direct quote from the Molinaro case that's in the commentary. So, again, this was the instruction initially requested by the defendant, was the Molinaro language. Then he withdrew his objection in favor of the language proposed by Mr. Jennings. So Mr. Jennings got the only change to the instruction that he requested. And this cannot have been plain error to instruct the jurors based upon the law requested by the parties, specifically by the defense, and based upon the law as it existed at the time. Moreover, the defense – But what if a defense counsel said, I don't want you to give the reasonable doubt instruction, right? Well, I wouldn't go along with that, but, you know, by the same token, there could be instances where you wouldn't do what counsel said because you thought that it was wrong. That's correct, Your Honor, but there was nothing indicating that there was anything wrong with these instructions. So how could the court have plainly erred? In addition, these defendants were not precluded from arguing good faith was a defense. They both argued their good faith and that they did not have an intent to defraud. Yes, but the jury was being told, or at least could have understood that it was being told, that even if they believed that, that they didn't have – that they in fact believed the representations they were making, they could consider that, but they could balance it against something else, like these people lost a lot of money or something, and convict them. If the jury was being – now, one question I do have, though, is what was argued in the closing arguments? Was it argued – did the prosecutor argue that it was not a complete defense, or did he argue that – about the terms of the instruction or what? I have not read the closing arguments. No, Your Honor. I was the prosecutor, and I did not argue that. I generally spend most of my time arguing the facts of the case and the facts that show that the defendants had the intent to defraud. I did not argue – I don't believe the words good faith even came out of my mouth, because the evidence was so overwhelming of defendant's – defendant Jones's guilt, and the evidence was overwhelming as to defendant Jennings. Defendant Jennings was over the coal mines. Jones really didn't have anything to do with the coal mines. Jennings was the one in charge of the day-to-day operations of the coal mine, and the evidence was replete with his misrepresentations, his own misrepresentations. Certainly after some point, but what about that 2002 incident? Well, 2002 – and it did – the count wasn't limited to the Arkansas coal mine. The count was limited to a coal mine. So you're going to – Judge Berzon asked a question about the sufficiency of the evidence. I think I'm one count. So from your perspective, why was there sufficient evidence? Because, Your Honor, I think there was the – Was it count 15? It was count 15, Your Honor. And you just said it wasn't just the coal mine, and – but your defense of the evidence and was – of the conviction was based on some 2004 statements, and I don't know how you can do that. How can you go from what he knew in 2004 and 2005 to what he knew in 2002? Well, first of all, there's no evidence that he – there was no evidence presented that Jennings did not believe – or, excuse me, did believe Jones in 2002 when they were making these – But he doesn't have to do that. The burden's on you. That's why there are complaints here. Well, but, Your Honor, I guess my point is, and that's in response to the defense saying that Jennings still believed that there was no evidence introduced of that, that Jennings still believed Jones at the time of the trial. And in fact – I know, but that's not what I'm saying. But what about in 2002 did he believe? In 2002 – And my understanding is your argument is in 2004 and 2005 he didn't believe him. That doesn't seem to help very much. And some evidence about some other transaction that wasn't charged, this H.L. thing. And that's about it. I mean, what else evidence do you have with regards to the gold mine in 2002 that he knew that it didn't exist? The gold and the coal. Well, the gold transaction – But the coal was the wrong coal mine, so that can't work. So what about the coal? Although the witness testified at trial that his understanding was coal mines in Kentucky – it's cited specifically in our answering brief. What the witness testified about was coal mines in Kentucky and I believe he said Arkansas as well. So he listed the various places where he was told the coal mines existed. And with respect to the gold transaction, Harry who had already had Jennings having been soliciting investments for a variety of outlandish investments for seven years prior that's attached to the government's 404B motion having to do with other investments other than this $56 million Seychelles transaction. In addition, by that point in time, they had already taken $180,000 from Roger Soane, that particular victim, without any payout and had been telling him, oh, we've got the Seychelles transaction, it's great, it's great, it's great, you know, we're going to make a lot of money. And then all of a sudden it faded into the background and they start trying to pitch him on something else. So tell me, as to count 15, when you evaluate sufficiency of the evidence, what was the evidence in the light most favorable to the verdict, you know, and giving you all inferences, what was the evidence that a jury could support that? The jury could reasonably infer and conclude that Defendant Jennings had a pattern engaging in fraudulent conduct. What you're saying is it's because he lied about something else before and something else later. That's what you're saying. Essentially, yes, Your Honor. That's not much of an inference. Well, giving all the inferences in favor of the government. I'm trying to understand what you're both saying, just so that I'm hearing her to say that she's compartmentalizing the evidence and you're saying the jury could consider other evidence to evaluate count 15. That's correct. All of the evidence that was presented to the jury, they could reasonably infer it was fraudulent intent all along. And I do need to point out that this issue was not raised in the court below. It was raised for the first time on appeal. So I think that under the plain error standard and giving the – viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for the jury to find that Defendant Jennings had an intent to defraud Roger Stone. This was not the first investment from the – Pardon me? Do you want to say – have anything to say about the sentence issue? Apparently, you thought that Jennings should get more of a departure, I guess, because he didn't get as much money, too. But then the court said, no, no, no, no. You know, that was the court's statement, Your Honor, although the court actually gave Jennings a much lower sentence than what the government requested. I don't recall specifically what we requested. I think it was about 14 years and he got 12 years. We did move for a two-level Booker variance downward to reflect the fact that he had received less money. But I think overall, the sentences that – the sentence that Jennings received was reasonable. The court gave a 66-month downward variance to Jennings. Was the court bothered by the fact that this man was a person of the clergy and he prayed with these people or – Well, I think everyone was bothered by that. There were lots of prayer calls. God was used frequently. You know, when things weren't – I mean, year after year, month after month, year after year, there were these conference calls almost every night where people were told a different story every single night and God was invoked quite a bit. We didn't overemphasize that at trial. In fact, I barely touched upon that. I mean, it was there. It was the elephant in the room. But the court was definitely bothered by the fact that Jennings used religion. So you didn't argue that God had this specific intent here? You know, but the fact that the court may have mentioned certain factors over others doesn't mean that he was giving any undue weight to things. I mean, the fact is that there were over 700 victims is, in fact, an aggravating factor. I don't know that anyone could say it's not an aggravating factor. The fact that so many people lost their money is an aggravating factor. And although Jennings did not personally profit as much as the others, he was the one in charge of the bank accounts. There also was some mention about someone who committed suicide and someone attempted to commit suicide or something? Pardon me. There was one suicide, a man named Wesley Montier, and there was also one attempted suicide. Montier was a financial planner in Utah who not only put all of his money in, he convinced a lot of other people to put their money in, and his brother, David Montier, was one of our witnesses at trial. The fact of the suicide did not come out in front of the jury, but David Montier himself had invested hundreds of thousands of dollars, but Wesley Montier, the financial planner. Well, he wasn't suspected of being involved in the suicide person, was not suspected of being involved in the scheme, or was that person suspected? We did not suspect him, although he was a financial planner representing to his clients that this was a good investment, which was obviously an unwise, turns out to have been an unwise thing, but he apparently was feeling tremendous guilt because he lost all of his own money and that of lots of other people. But I think the fact of the matter is that Jones got a much lower sentence than Jones, and so it shows that the court really did consider the 3553A factors, and Stenberg, although he got a three-year lower sentence than Jennings, Stenberg had a slightly larger role than Jennings, although Stenberg was not over the coal mines. That was Jennings. But Stenberg also pled guilty right away and got acceptance of responsibility and received a downward departure. Did he testify at trial too? No, he did not. We chose not to call him at trial. I just have one point to say about the Matthews case from the Supreme Court and other cases cited by Mr. Morris. Those all have to do with affirmative defenses of entrapment and self-defense, which are very, have different pleading requirements. It's very different than a good faith defense in a fraud case, and a good faith defense is part of the intent to defraud. Okay. Thank you very much. Thank you. Ms. Chen. Thank you, Your Honors. Very briefly, I just wanted to touch on two issues that the prosecutor raised based on alleged misrepresentations made by Mr. Jennings. The first in connection with reasonableness is the prosecutor said that Mr. Jennings made misrepresentations regarding the coal mines. And the fact was that Mr. Jennings only repeated what had been told to him. The mine manager, Mr. Schubert, told Mr. Jennings that But why couldn't the jury, after they heard all of this, this whole elaborate thing, why couldn't they think that everyone was in it from the beginning? That they were all, why would that not be an appropriate inference? Why, you know, how can, you know, I'm having a hard time seeing how you can compartmentalize the, you know, the evidence. They heard all of it, and it would seem that one inference they could make is that they thought that all of these people were in it from the get-go, and that was it. The jury isn't, they couldn't possibly have disbelieved the evidence. And if they could do that, then isn't there sufficient evidence? Okay, that's, I was focusing on reasonableness when I was discussing that. Okay. I did also want to focus on the insufficiency of the evidence, because there the prosecutor talked about the fact that Mr. Jennings had been involved in allegedly fraudulent investments before. And with respect to the previous investments, before the 2002 issue, in that case, Mr. Jennings devoted his entire pension into that. He accumulated $100,000 of credit card debt. He really believed in that investment.  That's your argument. That's our argument. At the end of the day, I don't know why the jury couldn't have just not believed any of that and said, hey, these guys were fraudulent, and they were in it from day one, and that's it. Your Honor is correct. I just wanted to point out that that's our evidence. And also, it all ties in with the jury instruction issue that we're raising. The jury was never told what it had to consider in return. What is your response to the Shipsea case and the fact that we're bound by it, even if incorrect? Well, I think, Your Honor, as Mr. Morris said, and as Your Honors have noted, this was just erroneous. The jury was erroneous. All right. Well, suppose it was erroneous. We're still bound by it. I'm sorry, Your Honor? If it was erroneous, we're still bound by the opinions. What do we do with it? Well, I think that there was intervening Supreme Court authorities. Mr. Morris discussed it. What was the intervening Supreme Court authorities? There was a 1988 case that stated that a panel can disregard prior panel members in order to handle decisions. What's the intervening Supreme Court case? Matthews. It was discussed in Mr. Morris' brief. And we're contending that there is intervening Supreme Court authority that allows this Court to disregard or, perhaps, if that doesn't work, it's something that we can raise on law. Thank you very much. Thank you, counsel, for your arguments. United States v. Jennings & Jones is submitted.
judges: Fletcher B. , Berzon, Callahan